## UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF KENTUCKY

| | |
|---|---|
| JOANNE BARROWS. SUSAN HAGOOD, SHARON MERKLEY, LORRAINE KOHL, and DOLLY BALANI, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> HUMANA, INC., <br><br> Defendant. | Civil File No. 3:23-cv-00654-RGJ <br><br> **CLASS ACTION COMPLAINT** <br><br><br> **DEMAND FOR JURY TRIAL** |

## PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiffs, JoAnne Barrows, Susan Hagood, Sharon Merkley, Lorraine Kohl, and Dolly Balani ("Plaintiffs"), individually and on behalf of all others similarly situated (the "Class" or "Classes"), by and through their attorneys, bring this class action against Defendant Humana, Inc. ("Defendant" or "Humana") and allege as follows:

## INTRODUCTION

1.      This putative class action arises from Humana's illegal and undisclosed deployment of artificial intelligence (AI) in place of real doctors. Humana employs this process to summarily deny elderly patients care owed to them under Medicare Advantage Plans on false pretenses. The AI Model, known as nH Predict, is used to override real treating physicians' determinations as to medically necessary care patients require. Humana knows that the nH Predict AI Model predictions are highly inaccurate and are not based on patients' medical needs but continues to use this system.

2.      By this action, Plaintiffs challenge the process employed by Humana to make claim determinations—i.e., its use of the nH Predict AI Model—and not the denial of any individual claim.

3.      Despite the high rate of wrongful denials, Humana continues to systemically use this flawed AI Model to deny claims because they know that only a tiny minority of policyholders (roughly 0.2%)[1] will appeal denied claims, and the vast majority will either pay out-of-pocket costs or forgo the remainder of their prescribed post-acute care. Humana banks on the patients' impaired conditions, lack of knowledge, and lack of resources to appeal the wrongful AI-powered decisions.

4.      The fraudulent scheme affords Humana a clear financial windfall in the form of policy premiums without having to pay for promised care, while the elderly are prematurely kicked out of care facilities nationwide, forced to deplete family savings to continue receiving necessary medical care, or forced to forgo care altogether, all because an AI Model "disagrees" with their real live doctors' determinations.

5.      Defendant Humana, Inc. is one of the nation's largest insurance companies. Humana provides Medicare Advantage health insurance plans for 5.1 million eligible Americans.[2]

6.      Humana masquerades as an insurer that brings "the human side of healthcare," claiming, "Our approach is simple—offer personalized care from people who

---

[1] Karen Pollitz, et al., *Claims Denials and Appeals in ACA Marketplace Plans in 2021*, KFF (Feb. 9, 2023) https://www.kff.org/private-insurance/issue-brief/claims-denials-and-appeals-in-aca-marketplace-plans/ (last visited Nov. 13, 2023).
[2] *For Each Person,* HUMANA, https://www.humana.com/about/impact/individual (last visited Nov. 30, 2023).

care."[3] Humana's CEO Bruce Broussard claims Humana is "continuously working to remove barriers to health and to provide quality care."[4] In reality, Humana systematically deploys the nH Predict AI Model to prematurely and in bad faith discontinue payment for healthcare services for elderly individuals with serious diseases and injuries. These elderly patients are left either with overwhelming medical debt, or without the medical care that they require.

7.     The nH Predict AI Model determines Medicare Advantage patients' coverage criteria in post-acute care settings with rigid and unrealistic predictions for recovery.[5] Relying on the nH Predict AI Model, Humana purports to predict how much care an elderly patient "should" require but overrides real doctors' determinations as to the amount of care a patient in fact requires to recover. As such, Humana makes coverage determinations not based on individual patient's needs, but based on the outputs of the nH Predict AI Model, thus maximizing the likelihood of inappropriate denial of necessary care prescribed by the patients' doctors. Humana's implementation of the nH Predict AI Model resulted in a significant increase in the number of post-acute care coverage denials.

8.     Through this faulty process, Humana intentionally limits its employees' discretion to deviate from the nH Predict AI Model predictions by collaborating with naviHealth to set targets to keep stays at post-acute care facilities within 1% of the days

---

[3] *About Humana,* HUMANA, https://www.humana.com/about (last updated Nov. 9, 2023).
[4]   *Letter From Humana's President and Chief Executive Officer*, HUMANA, https://www.humana.com/about/ceo-message (last updated Nov. 9, 2023).
[5] Casey Ross and Bob Herman, *Denied by AI: How Medicare Advantage plans use algorithms to cut off care for seniors in need*, STAT (Mar. 13, 2023), https://www.statnews.com/2023/03/13/medicare-advantage-plans-denial-artificial-intelligence/ (last visited Nov. 13, 2023).

projected by the AI Model.[6] Employees who deviate from the nH Predict AI Model projections are disciplined and terminated, regardless of whether a patient requires more care.[7]

9.    The nH Predict AI Model saves Humana money by allowing them to deny claims they are obligated to pay and otherwise would have paid by eliminating the labor costs associated with paying doctors and other medical professionals for the time needed to conduct an individualized, manual review of each of its insured's claims.

10.    Humana also utilizes the nH Predict AI Model to aggressively deny coverage because they know they will not be held accountable for wrongful denials.

11.    In many instances, Humana purposefully shifts the financial responsibilities of funding post-acute care of its insureds to American taxpayers. In its coverage denial letters, Humana informs patients who qualify for Medicare that their coverage is being denied solely due to their Medicare eligibility. Humana directs these patients to enroll in the government-subsidized Medicare program despite knowing that its use of the nH Predict AI Model will result in wrongful denials of coverage.

12.    Plaintiffs and Class members had their post-acute care coverage determined by the nH Predict AI Model. Humana failed to use reasonable standards in evaluating the

---

[6] Casery Ross and Bob Herman, *UnitedHealth Pushed Employees to Follow an Algorithm to Cut Off Medicare Patients' Rehab Care*, STAT (Nov. 14, 2023), https://www.statnews.com/2023/11/14/unitedhealth-algorithm-medicare-advantage-investigation/#:~:text=The%20nation's%20largest%20health,a%20STAT%20investigation%20has%20found. (Humana uses the same nH Predict model as UnitedHealth).
[7] *Id.*

individual claims of Plaintiffs and Class members and instead allowed their coverage needs to be wholly determined by AI.

13.     By engaging in this misconduct, Humana breached its fiduciary duties, including the duties of good faith and fair dealing, because its conduct serves Humana's own economic self-interest and elevates Humana's interests above the interests of the insureds.

14.     By bringing this action, Plaintiffs seek to remedy Humana's past improper and unlawful conduct by recovering damages to which Plaintiffs and the Class are rightfully entitled and enjoin Humana from continuing to perpetrate its scheme against its Medicare Advantage insureds.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1332(d)(2). This is a class action in which there is a diversity of citizenship between at least one Plaintiff Class member and one Defendant; the proposed Classes each exceed one hundred members; and the matter in controversy exceeds the sum of $5,000,000.00, exclusive of interest and costs.

16.     In addition, under 28 U.S.C. §1367, this Court may exercise supplemental jurisdiction over the state law claims because all claims are derived from a common nucleus of operative facts and are such that Plaintiffs would ordinarily expect to try them in one judicial proceeding.

17.     This Court has personal jurisdiction over Humana, Inc. because Humana, Inc. is headquartered in Kentucky, has sufficient minimum contacts with Kentucky, and

otherwise purposefully avail themselves of the benefits and protections of Kentucky law, so as to render the exercise of jurisdiction by this Court proper and consistent with traditional notion of fair play and substantial justice.

18.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391. Humana, Inc. regularly conducts business in this District, and a substantial part of the events giving rise to the claims asserted herein occurred in this District. Humana, Inc. resides in this District, being headquartered at 500 West Main St., Louisville, KY 40202.

## THE PARTIES

19.    **Plaintiff JoAnne Barrows.** JoAnne Barrows was at all times relevant to this action a citizen of Minnesota, residing in Hennepin County. At all relevant times mentioned herein, Ms. Barrows was covered by a Medicare Advantage Plan policy provided by Humana.

20.    **Plaintiff Susan Hagood.** Susan Hagood was at all times relevant to this action a citizen of North Carolina, residing in Buncombe County. At all relevant times mentioned herein, Ms. Hagood was covered by a Medicare Advantage Plan policy provided by Humana.

21.    **Plaintiff Sharon Merkley.** Plaintiff Sharon Merkley was at all times relevant to this action a citizen of Kentucky, residing in Daviess County. At all relevant times mentioned herein, Mrs. Merkley was covered by a Medicare Advantage Plan policy provided by Humana.

22.    **Plaintiff Lorraine Kohl.** Plaintiff Lorraine Kohl was at all times relevant to this action a citizen of Wisconsin, residing in Outagamie County. At all relevant times

mentioned herein, Mrs. Kohl was covered by a Medicare Advantage Plan policy provided by Humana.

23.     **Plaintiff Dolly Balani.** Plaintiff Dolly Balani was at all times relevant to this action a citizen of Texas, residing in Cameron County. At all relevant times mentioned herein, Mrs. Balani was covered by a Medicare Advantage Plan policy provided by Humana.

24.     **Defendant Humana, Inc.** Humana, Inc. is a Delaware corporation, headquartered at 500 West Main St., Louisville, KY 40202. Humana, Inc. conducts insurance operations throughout the country, representing to consumers that it "mak[es] healthcare more equitable and accessible," and that it "make[s] it easier for people to achieve their best health."[8] Humana, Inc. has a license to use the federally registered service mark "HUMANA," markets and issues health insurance and insures, issues, administers, and makes coverage and benefit determinations related to the health care policies nationally through its controlled agents and undisclosed principals and agents. Defendant Humana, Inc. is licensed and registered to conduct business in all 50 states, and does conduct business in all 50 states, and is thereby subject to the laws and regulations of all 50 states.

## FACTUAL ALLEGATIONS

### A. Background

25.     Humana offered and sold Medicare Advantage health insurance plans to consumers, including Plaintiffs and Class members.

---

[8] *Humana's Impact*, HUMANA, https://www.humana.com/about/impact (last updated Nov. 9, 2023).

26. A Medicare Advantage plan is a type of health plan offered by private companies that contract with Medicare. Medicare Advantage is a taxpayer-funded alternative to traditional Medicare that covers 30.8 million people.[9] Medicare Advantage accounts for more than half (51 percent) of the eligible Medicare population, and $454 billion (or 54 percent) of total federal Medicare spending.[10]

27. Plaintiffs and Class members enrolled with Humana to receive Medicare Advantage health insurance coverage. Humana provided Plaintiffs and members of the Class with written terms explaining the plan coverage Humana offered to them. According to these terms, Humana is obligated to provide benefits for covered health services and must pay all reasonable and medically necessary expenses incurred by a covered member.

28. From at least December 12, 2019, to the present (the "Relevant Period"), Plaintiffs and Class members were referred to and received "post-acute care"—medically necessary care for patients recovering from serious illnesses and injuries. Post-acute care is covered by the terms of their insurance agreements provided by Humana.

29. Post-acute care encompasses skilled care, therapy, and other services provided by home health agencies (HHAs), skilled nursing facilities (SNFs), inpatient rehabilitation facilities (IRFs), acute inpatient rehab facilities (AIRs), acute rehab units (ARUs), and long-term care hospitals (LTCHs), collectively known as post-acute care (PAC) providers because they typically furnish care after an inpatient hospital stay.

---

[9] Nancy Ochieng, et al., *Medicare Advantage in 2023: Enrollment Update and Key Trends*, KFF (Aug. 9, 2023), https://www.kff.org/medicare/issue-brief/medicare-advantage-in-2023-enrollment-update-and-key-trends/ (last visited Nov. 13, 2023).
[10] *Id.*

30.     Medicare Advantage providers use a prospective payment system for each type of PAC provider. Under this system, insurers pay PAC providers an upfront fee that is based on estimates of the national average cost of providing covered care for a specified period of time.

31.     Due to the nature of the prospective payment system, insurers' coverage decisions occur before or during a patient's post-acute care. When the insurer decides to end coverage before the doctor's requested discharge date for the patient, the patients are left with an impossible choice: to either forgo their post-acute care despite not being well enough to function without it or pay out-of-pocket to continue receiving care they were wrongfully denied—if they can afford it.

32.     Other patients are denied coverage before they receive any post-acute care. When patients are referred to post-acute care facilities by their doctors, Defendants use the nH Predict AI Model to deny prior authorization requests, regardless of the patients' actual conditions or doctors' recommendations.

33.     Humana created and instituted a process designed to override and circumvent doctors from determining individual coverage for post-acute care in a thorough, fair, and objective manner, instead using the nH Predict AI Model to supplant real doctors' recommendations and patients' medical needs. Humana's use of the nH Predict AI Model, which directs Humana's medical review employees to prematurely stop covering care

without considering an individual patient's needs, is systematic, illegal, malicious, and oppressive.[11]

34.    The nH Predict AI Model attempts to predict the amount of post-acute care a patient "should" require, pinpointing the precise moment when Humana will cut off payment for a patient's treatment. If the nH Predict AI Model determines the patient shouldn't require any post-acute care, it recommends denial of prior authorization. The nH Predict AI Model compares a patient's diagnosis, age, living situation, and physical function to similar patients in a database of six million patients it compiled over the years of working with providers to predict patients' medical needs, estimated length of stay, and target discharge date[12].

---

[11] Casey Ross and Bob Herman, *Denied by AI: How Medicare Advantage plans use algorithms to cut off care for seniors in need*, STAT (Mar. 13, 2023), https://www.statnews.com/2023/03/13/medicare-advantage-plans-denial-artificial-intelligence/ (last visited Nov. 13, 2023).
[12] *Id.*

35.    The following is a true and correct representation of a sample nH Predict

Outcome sheet, taken from a naviHealth presentation:[13]



36.     Humana wrongfully delegates its obligation to evaluate and investigate claims to the nH Predict AI Model. The nH Predict AI Model spits out generic recommendations based on incomplete and inadequate medical records and fails to adjust for a patient's individual circumstances and conflicts with basic rules on what Medicare Advantage plans must cover.

37.     Upon information and belief, the nH Predict AI Model applies rigid criteria from which Humana's employees are instructed not to deviate. The employees who deviate from the nH Predict AI Model prediction are disciplined and terminated, regardless of whether the additional care for a patient is justified.

38.     Under Medicare Advantage Plans, patients who have a three-day hospital stay are typically entitled to up to 100 days in a nursing home. With the use of the nH Predict AI Model, Humana cuts off payment in a fraction of that time. Patients rarely stay in a nursing home more than 14 days before they start receiving payment denials.[14]

39.     Upon information and belief, the outcome reports generated by nH Predict are rarely, if ever, communicated with patients or their doctors. When patients and doctors request their nH Predict reports, Humana's employees deny their requests and tell them that the information is proprietary.

---

[13]     *NaviHealth Guiding the Way – Animated Explainer*, ECG PRODUCTIONS https://www.ecgprod.com/navihealth-guiding-the-way-animated-explainer/ (last visited Nov. 13, 2023).

[14]     Casey Ross and Bob Herman, *Denied by AI: How Medicare Advantage plans use algorithms to cut off care for seniors in need*, STAT (Mar. 13, 2023) https://www.statnews.com/2023/03/13/medicare-advantage-plans-denial-artificial-intelligence/ (last visited Nov. 13, 2023).

40.     Denials issued by Humana are appealable to Quality Improvement Organizations ("QIOs"), independent third-party organizations established to review claims determinations, per the Medicare Act. These QIOs can overturn denials and reinstate benefits in individual cases. There is, therefore, no way for any individual patient to understand the actual basis for Humana's refusal to pay and there is no way for any individual patient to challenge the systematic process that leads to that refusal.

41.     Upon information and belief, over 90 percent of patient claim denials are reversed through either an internal appeal process or through federal Administrative Law Judge (ALJ) proceedings. Additionally, over 80 percent of prior authorization request denials are reversed on appeal.[15] This demonstrates the blatant inaccuracy of the nH Predict AI Model, and the lack of human review involved in the coverage denial process. The problem with this process is systemic. It is inherently unfair for Humana to employ a coverage determination process that it knows will result in improper denials while ignoring the recommendations of doctors.

42.     Plaintiffs' and the Class's use of this appeals system is generally futile. Under the Medicare Act, the decisionmakers on appeal only have the authority to reinstate benefits—they lack the authority to enjoin Humana from abusing the nH Predict AI Model to make coverage determinations, which is a part of the relief sought by Plaintiffs.

43.     Additionally, upon information and belief, even if Plaintiffs or the Class succeed on any individual appeal, Humana and its contractor naviHealth request updated

---

[15] *Examining Health Care Denials and Delays in Medicare Advantage Before the Permanent Subcommittee on Investigations*, 118th Cong. (2023) (statement of Sen. Richard Blumenthal, Chairman, Permanent Subcommittee on Investigations).

medical records, issue another denial, and force patients to restart the appeals process with the goal of depriving patients of the opportunity to receive additional care.

44.     Upon information and belief, naviHealth employees are given a length of stay "budget," and if the cases they oversee come in under that budget, they receive bonus compensation.

45.     If Plaintiffs were required to exhaust their administrative remedies before bringing this action in court, they would suffer irreparable harm. To reach the highest level of appeal before the Medicare Appeals Council often takes years.[16] While waiting for a decision, Plaintiffs, like all patients, would be left with two options: (1) to stay in post-acute care facility and risk being responsible for months' or years' worth of medical bills if their appeals are denied; or (2) to forgo care while they wait for a decision to be made on their appeals. Plaintiffs are elderly and/or ill patients who have suffered serious medical traumas. If they opt to forgo care while waiting for a decision on appeal, they risk further serious injury.

46.     If Plaintiffs were required to exhaust their appeals before bringing this action in court, Humana's misconduct would be capable of repetition while evading review. Humana knows that if patients are required to exhaust their remedies, they need only pay the relatively small claims appealed before they reach the highest level of appeal, and their systemic misconduct would never be reviewable in court.

---

[16] Casey Ross and Bob Herman, *Denied by AI: How Medicare Advantage plans use algorithms to cut off care for seniors in need, STAT* (Mar. 13, 2023) https://www.statnews.com/2023/03/13/medicare-advantage-plans-denial-artificial-intelligence (quoting Chris Comfort, COO of Calvary Hospital, as stating that the appeals process lasts up to 2.5 years, often leading to appeals that "outlast[] the beneficiary.").

47.     Roughly 0.2% of consumers appeal their health insurance claim denials.[17] Far fewer pursue their appeal to the third level, before an administrative law judge. Upon information and belief, when a patient appeals to an ALJ, Humana selectively does not contest the appeal after scrutinizing the assessment of the nH Predict AI Model—Humana instead agrees to pay the claims. Upon information and belief, in doing so, Humana pays the claims of less than 0.2% of consumers and ensures that no claims make it to the Medicare Appeals Council, and thus nobody exhausts their administrative remedies. In this way, Humana ensures that if patients are required to exhaust their administrative remedies, they will be able to fraudulently review and deny over 99% of claims without their misconduct being reviewable in court.

48.     Humana fraudulently misled its insureds into believing that their health plans would individually assess their claims and pay for medically necessary care.

49.     Had Plaintiffs and Class members known that Humana would evade the legally required process for reviewing patient claims and instead delegate that process to its nH Predict AI Model to review and deny claims, they would not have enrolled with Humana and/or would not have paid for their plan the amount they had to pay to be enrolled.

50.     Humana's use of the nH Predict AI Model to deny its insureds' claims undermines the principles of fairness and meaningful claim evaluation, which insureds expect from their insurers.

---

[17] *See supra* note 1.

### B.  **Plaintiff JoAnne Barrows**

51.    Plaintiff JoAnne Barrows is enrolled in the Medicare Advantage Plan provided by Humana.

52.    In November of 2021, 86-year-old JoAnne Barrows fell at home and fractured her leg. On or around November 23, 2021, Ms. Barrows was admitted to Methodist Hospital in St. Louis Park, Minnesota, where she was placed in a cast and put on a non-weight-bearing order for six weeks.

53.    On or around November 26, 2021, Ms. Barrows was discharged from Methodist Hospital and admitted to the Good Samaritan Society Ambassador rehabilitation facility in Robbinsdale, Minnesota.

54.    On or around December 9, 2021, Humana informed Ms. Barrows that they were terminating her coverage in two days, on December 11, after only approximately two weeks of care.

55.    Ms. Barrows and her doctor were bewildered by Humana's premature termination of coverage because Ms. Barrows was still under a non-weight-bearing order for four more weeks. Ms. Barrows's doctor recommended that she continue rehabilitation treatment, but Humana refused to cover additional treatment.

56.    Ms. Barrows and her family vigorously appealed Humana's denial, but their efforts were unsuccessful. The appeals were denied, and Humana deemed Ms. Barrows ready to return home despite being bedridden and using a catheter.

57.     Because Ms. Barrows was not yet fit to return home, her family had no choice but to pay for her stay at the Good Samaritan Society Ambassador rehabilitation facility out of pocket.

58.     Due to the high cost of the Good Samaritan Society Ambassador rehabilitation facility, Ms. Barrows' family made the difficult decision to transfer her to an assisted living facility, which was less expensive.

59.     Unfortunately, the care provided at the assisted living facility was substandard, resulting in the deterioration of Ms. Barrows's condition.

60.     As a result, Ms. Barrows's family had to make another difficult decision and end her care due to the poor quality of care she was receiving. On or around December 22, 2021, Ms. Barrows returned home, but she was not in a physical state to be there safely. She was unable to use her injured leg, could not go to the restroom without assistance, and still had a catheter in.

61.     Due to Humana's wrongful denial of coverage, Ms. Barrows health was significantly impacted as she could not afford to receive the care she needed and was entitled to. Ms. Barrows also suffered significant economic losses in the form of out-of-pocket payments for treatment that should have been otherwise covered by her plan.

C.  **Plaintiff Susan Hagood**

62.     Plaintiff Susan Hagood is enrolled in the Medicare Advantage plan provided by Humana.

63.     On or around September 10, 2022, Ms. Hagood was admitted to Mission Hospital in Asheville, North Carolina, with a urinary tract infection, sepsis, and a spinal infection.

64.     On or around October 26, 2022, Ms. Hagood was discharged from Mission Hospital with eleven discharging diagnoses, including sepsis, acute kidney failure, kidney stones, nausea and vomiting, a urinary tract infection, osteomyelitis of lumbar spine, and an L3 phlegmon.

65.     She was admitted to a skilled nursing facility, The Oaks at Brevard, the same day. During her time at the skilled nursing facility, Ms. Hagood was on a maximum allowable dose of oxycodone and constantly endured exceptionally high pain levels.

66.     Additionally, Ms. Hagood suffered from low oxygenation, which developed into pneumonia.

67.     After a telehealth conference with her infectious disease specialist on or around November 15, 2022, Ms. Hagood scheduled an appointment at Mission Hospital for November 28, 2022.

68.     Upon return to Mission Hospital on November 28, 2022, she experienced a rapid spike in blood pressure and was taken to the emergency room, where it was discovered that Ms. Hagood's condition had worsened considerably. She was diagnosed with a multi-level disc edema with discitis osteomyelitis, consolidative phlegmon within her epidural spaces, a large staghorn calculus in each kidney, and pneumonia.

69.     On or around November 27, 2022, Humana denied Ms. Hagood's claim for the treatment she received at The Oaks at Brevard between November 14 and November

28, refusing to pay for half of her month-long stay. Despite Ms. Hagood's critical condition, Humana denied her coverage, explaining that Ms. Hagood did not require the level of care a skilled nursing facility provided and should be discharged home.

70.    Ms. Hagood and her family have incurred over $24,000 in out-of-pocket medical expenses for treatment that Humana should have covered.

71.    To date, Ms. Hagood remains in a skilled nursing facility and requires ongoing medical care due to her health condition.

### D.    **Plaintiff Sharon Merkley**

72.    Plaintiff Sharon Merkley is enrolled in a Medicare Advantage plan with Humana. She pays a monthly premium of $46.00 for that plan.

73.    Mrs. Merkley suffers from Parkinson's Disease, HTN, atrial fibrillation, and arthritis.

74.    On or around November 4, 2023, Mrs. Merkley was admitted to Vanderbilt University Medical Center in Nashville, Tennessee, after experiencing severe hives, high blood pressure, and an inability to walk. Mrs. Merkley was diagnosed with an autoimmune disease called bullous pemphigoid.

75.    Mrs. Merkley was treated at Vanderbilt until November 16, 2023, when she was discharged and transferred to a skilled nursing facility, Signature Healthcare in Hartford, Kentucky.

76.    On or around November 16, 2023, Humana approved prior authorization for the skilled nursing care, sending Mrs. Merkley a letter confirming the approval. However, Humana did not specify a length of stay (denoted by "Unit(s) Approved") in the letter.

77.     On or around November 17, 2023, naviHealth sent Mrs. Merkley a letter noting the prior authorization, indicating that Mrs. Merkley's coverage determinations would be processed by naviHealth and the nH Predict AI Model. Unlike Humana's letter, naviHealth limited Mrs. Merkley's length of stay to "3" Unit(s) Approved.

78.     On or around December 6, 2023, Humana issued a Notice of Medicare Non-Coverage, terminating Mrs. Merkley's coverage, effective December 8, 2023.

79.     Mrs. Merkley appealed this denial to Kepro, a QIO. On or around December 7, 2023, Kepro granted Mrs. Merkley's appeal, reinstating coverage. Kepro determined that the skilled nursing services were medically necessary, because Mrs. Merkley "[could] not walk and require[d] maximum assistance with two-person assistance for bed mobility," could only "stand for 25 seconds," required "moderate assistance with upper body dressing and toileting and maximum assistance with upper and lower body bathing and lower body dressing," and she had "an open would to [her] sacrum." Kepro determined that Mrs. Merkley required 24-hour care.

80.     Despite Mrs. Merkley's condition, Humana issued another denial just four days later, on or around December 11, 2023. Coverage was to be terminated on December 13, 2023.

81.     Mrs. Merkley again appealed the denial to Kepro, and on or around December 13, 2023, Kepro determined that skilled nursing care was still medically necessary, reinstating coverage.

82.     Humana issued another denial the very next day, on or around December 14, 2023, terminating coverage effective December 16, 2023. Mrs. Merkley appealed, and Kepro once again overturned the denial.

83.     Humana issued a fourth denial on or around December 20, 2023, terminating coverage effective December 22, 2023. Mrs. Merkley appealed, and Kepro once again overturned the denial.

84.     Humana issued a fifth denial the very same day, on or around December 22, 2023, terminating coverage on Christmas Eve, December 24, 2023. Mrs. Merkley appealed, and Kepro once again overturned the denial.

85.     Humana issued a sixth denial on or around December 28, 2023, terminating coverage effective December 30, 2023. Mrs. Merkley appealed, and Kepro once again overturned the denial.

86.     Humana issued a seventh denial on or around January 5, 2024, terminating coverage effective January 7, 2024. Mrs. Merkley appealed, but this time Humana received the break it had been fishing for—Kepro denied the appeal. Mrs. Merkley elevated to a second-level appeal, which Kepro again denied on or around January 10, 2024. After her appeals were resolved, on January 18, 2024, Mrs. Merkley returned home. She was not medically fit to return home—she was unable to walk, she had active sores requiring wound care, and she still required 24-hour care to function.

87.     At home, Mrs. Merkley's rehab care was limited to twice-weekly home-healthcare visits.

88.     On or around January 30, 2024, Mrs. Merkley contacted the skilled nursing facility to schedule her Dupixent injection, for which she was a week past due. The facility informed her that Humana refused to pay for the injection. Mrs. Merkley was unable to receive her injection and suffered from a renewed breakout of hives caused by her bullous pemphigoid.

89.     On or around February 1, 2024, Mrs. Merkley was admitted to Owensboro Health Regional Hospital in Owensboro, Kentucky, because of the consequences of not receiving her injection and a urinary tract infection. On or around February 6, 2024, Humana refused to cover any further inpatient care in Owensboro Health Regional Hospital. Upon discharge on or around February 6, 2024, she was transferred to another skilled nursing facility, Chautauqua Health and Rehabilitation of Owensboro.

90.     On or around February 14, 2024, Humana issued a Notice of Medicare Non-Coverage, terminating coverage effective February 16, 2024. Mrs. Merkley appealed, and Kepro overturned the denial, reinstating coverage.

91.     Three days later, on or around February 19, 2024, Humana issued another denial, terminating coverage effective February 21, 2024. Mrs. Merkley appealed, and Kepro once again overturned the denial.

92.     On or around February 26, 2024, Humana issued a third denial, terminating coverage effective February 28, 2024. Mrs. Merkley appealed, and Kepro once again overturned the denial.

93.     On or around March 5, 2024, Humana issued a fourth denial, terminating coverage effective March 7, 2024. Mrs. Merkley appealed, and Kepro once again overturned the denial.

94.     On or around March 11, 2024, Humana issued a fifth denial, terminating coverage effective March 13, 2024. Mrs. Merkley appealed, but this time Kepro denied her appeal. Mrs. Merkley elevated the appeal to a second-level appeal, which Kepro also denied. Mrs. Merkley was informed over the phone that her appeal had been denied, and she was not informed that she could appeal the decision further.

95.     Starting on March 14, 2024, Mrs. Merkley has paid out-of-pocket for her skilled nursing care. To date, she has paid $10,000, and has another outstanding bill for $15,000. She remains in the skilled nursing facility, working towards her recovery.

**E.   Plaintiff Lorraine Kohl**

96.     Plaintiff Lorraine Kohl is enrolled in a Medicare Advantage plan with Humana. She pays a monthly premium of $224.00 for that plan.

97.     On or around December 15, 2022, Mrs. Kohl fell and fractured her right hip. She was admitted to St. Elizabeth Hospital in Appleton, Wisconsin, where she underwent surgery to treat the fracture on or around December 17, 2022. On or around December 20, 2022, Mrs. Kohl was transferred to Oakridge Gardens Nursing Center, a skilled nursing facility in Menasha, Wisconsin.

98.     On or around January 4, 2023, just shy of three weeks after fracturing her hip, Humana issued a denial, refusing to cover Mrs. Kohl's rehabilitation care effective January 6, 2023. The same day, Mrs. Kohl received a separate letter from naviHealth,

explaining that coverage was denied and claiming she needed "little" help to move around and perform self-care skills. At the time of the denial, Mrs. Kohl was unable to walk, as she could not lift her right leg unassisted.

99.     On or around January 4, 2023, Mrs. Kohl appealed the denial to Livanta. On January 6, 2023, Livanta denied her appeal, claiming the care was no longer medically necessary.

100.    Rather than elevating to a second-level appeal before Livanta, Mrs. Kohl's family opted to write a letter on or around January 6, 2023, and appeal the decision through Humana directly. On or around January 7, 2023, Mrs. Kohl was informed that Humana denied her appeal.

101.    On or around January 28, 2023, Mrs. Kohl suffered another fall while at Oakridge Gardens, fracturing her left hip. She was transported by ambulance to St. Elizabeth Hospital, where she remained and received care until February 1, 2023. On or around February 1, 2023, Mrs. Kohl and her doctor sought prior authorization from Humana to receive further skilled nursing care, but Humana denied prior authorization, stating that she did not meet the criteria for skilled nursing services.

102.    Despite this denial, Mrs. Kohl was then transferred back to Oakridge Gardens for more skilled nursing care—her doctor was adamant that she needed skilled nursing care to recover, so Mrs. Kohl decided to appeal the prior authorization and, if all else failed, pay out-of-pocket to get the care she needed.

103.    On or around February 14, 2023, Mrs. Kohl visited her doctor, who provided a written recommendation that she continue receiving skilled nursing care. Her doctor

stated that skilled nursing care was "very medically necessary considering her injuries, subsequent surgeries, and need for additional physical therapy and conditioning. She has demonstrated adequate progression and will need to continue these therapies at Oak Ridge in order to improve her overall mobility and to maintain her safety."

104.    On or around February 21, 2023, Mrs. Kohl appealed her prior authorization denial to Humana directly. On or around February 27, 2023, Humana granted her appeal and paid for her care for the month of February.

105.    On or around March 1, 2023, Humana issued a denial letter, terminating Mrs. Kohl's coverage as of March 3, 2023. That same day, Mrs. Kohl appealed the denial to Livanta.

106.    On or around March 3, 2023, Livanta denied Mrs. Kohl's appeal. Livanta noted that Mrs. Kohl "currently requires maximal help to total dependence for self-care activities, such as dressing, bathing, and toileting."

107.    Mrs. Kohl was billed out-of-pocket from March 4, 2023, to April 4, 2023, when she left Oakridge Gardens and returned home. She has an outstanding balance of $22,806.70.

**F.  Plaintiff Dolly Balani**

108.    Plaintiff Dolly Balani is enrolled in a Medicare Advantage plan with Humana. She pays a monthly premium of $137.40 for that plan. Starting December 1, 2023, Mrs. Balani's monthly premium was increased to $262.10.

109.    Mrs. Balani suffers from Parkinson's Disease and arthritis, causing her to be at-risk of falls. On or around November 28, 2023, Mrs. Balani suffered a fall, fracturing her hip. She was admitted to Valley Baptist Medical Center in Brownsville, Texas.

110.    Mrs. Balani's doctor recommended she be transferred to an inpatient rehab facility for two weeks. During preadmission screening, Mrs. Balani required substantial to maximal assistance with bed mobility, transfers, and ambulation. She was also deemed a fall risk.

111.    On December 1, 2023, Humana denied prior authorization for Mrs. Balani's inpatient rehab care, claiming inpatient rehab was not medically necessary.

112.    On December 11, Mrs. Balani was discharged from Valley Baptist Medical Center and was transferred to South Texas Rehabilitation Hospital, in inpatient rehabilitation facility. Because of Humana's denial, she paid out-of-pocket for one week of care. Mrs. Balani paid $8,724 for her week in South Texas Rehabilitation Hospital.

113.    Mrs. Balani made significant progress towards her recovery during her week in South Texas Rehabilitation Hospital. Unfortunately, Mrs. Balani was unable to pay for a second week of care out of pocket, so she did not receive the full two weeks of care recommended by her doctor.

114.    Mrs. Balani appealed the decision to Maximus, a QIO. On December 14, 2023, Maximus denied the appeal, upholding the finding that the care was not medically necessary.

115.    Mrs. Balani submitted a second-level appeal, seeking reconsideration from Maximus. Maximus denied the appeal.

116.    On December 19, Mrs. Balani was discharged from South Texas Rehabilitation Hospital, and returned home. She still required physical therapy, occupational therapy, and wound care. Mrs. Balani received weekly in-home therapy and wound care until April of 2024. She now receives weekly home-health visits.

117.    On December 26, 2023, Mrs. Balani again elevated her appeal, seeking review by an administrative law judge. On February 15, 2024, the ALJ held a hearing on the matter. On February 29, 2024, the ALJ upheld the denial, finding that inpatient rehab services were not medically necessary.

118.    Mrs. Balani has appealed the ALJ's decision to the Medicare Appeals Council. A hearing is yet to be calendared.

119.    On January 1, 2024, Mrs. Balani did not renew her Humana Medicare Advantage plan, instead opting to enroll in traditional Medicare.

## CLASS ALLEGATIONS

120.    Plaintiffs bring this action on their own behalf and on behalf of all other persons similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure. The Class which Plaintiffs seek to represent comprises:

> "All persons who purchased Medicare Advantage Plan health insurance from Defendant in the United States during the period of four years prior to the filing of the complaint through the present."

Said definition may be further defined or amended by additional pleadings, evidentiary hearings, a class certification hearing, and orders of this Court.

121.   The Multi-State subclass which Plaintiffs seek to represent comprises:

"All persons who purchased Medicare Advantage Plan health insurance from Defendant during the period of four years prior to the filing of the complaint through the present in the following states: Arizona, California, Colorado, Delaware, Hawaii, Iowa, Kentucky, Massachusetts, Nebraska, North Carolina, North Dakota, Ohio, Oklahoma, Rhode Island, South Carolina, South Dakota, Vermont, Washington, West Virginia, Wisconsin, and Wyoming."

Said definition may be further defined or amended by additional pleadings, evidentiary hearings, a class certification hearing, and orders of this Court.

122.   The North Carolina Subclass which Plaintiffs seek to represent comprises:

"All persons who purchased Medicare Advantage Plan health insurance from Defendant in the state of North Carolina during the period of four years prior to the filing of the complaint through the present."

123.   The Minnesota Subclass which Plaintiffs seek to represent comprises:

"All persons who purchased Medicare Advantage Plan health insurance from Defendant in the state of Minnesota during the period of four years prior to the filing of the complaint through the present."

124.   The Kentucky Subclass which Plaintiffs seek to represent comprises:

"All persons who purchased Medicare Advantage Plan health insurance from Defendant in the state of Kentucky during the period of four years prior to the filing of the complaint through the present."

125. The Wisconsin Subclass which Plaintiffs seek to represent comprises:

"All persons who purchased Medicare Advantage Plan health insurance from Defendant in the state of Wisconsin during the period of four years prior to the filing of the complaint through the present."

126. The Texas Subclass which Plaintiffs seek to represent comprises:

"All persons who purchased Medicare Advantage Plan health insurance from Defendant in the state of Texas during the period of four years prior to the filing of the complaint through the present."

Said definition may be further defined or amended by additional pleadings, evidentiary hearings, a class certification hearing, and orders of this Court.

127. The Class is so numerous that their individual joinder herein is impracticable. On information and belief, members of the Class number in the thousands to millions throughout the United States and the named states. The precise number of Class members and their identities are unknown to Plaintiffs at this time but may be determined through discovery. Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Humana and third-party retailers and vendors.

128. Common questions of fact and law predominate over questions that may affect individual class members, including the following:

      a.    Whether Humana's delegation of coverage determinations to an automated procedure resulted in a failure to diligently conduct a thorough,

fair, and objective investigation into determinations of claims for medical expenses submitted by insureds and/or healthcare providers;

b.      Whether Humana automatically denied coverage for claims submitted by insureds and/or healthcare providers;

c.      Whether Humana's denials of coverage are based on its use of nH Predict AI Model to determine a patients' care needs based on Humana's or naviHealth, Inc.'s internally-generated criteria;

d.      Whether Humana failed to adopt and implement reasonable standards for the prompt investigation and processing of claims arising under insurance policies; and

e.      Whether Humana has a practice of relying on the nH Predict AI Model to make coverage denials instead of engaging in good-faith individual coverage determinations.

129.    Plaintiffs' claims are typical of the claims of the Class and arise from the same common practice and scheme used by Humana to deny coverage for the members of the Class. In each instance, Humana used the nH Predict AI Model to review, process, and reduce coverage without adhering to the coverage determination standards set by Medicare. Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained competent and experienced counsel in class action and other complex litigation.

130.    Plaintiffs and the Class have suffered injury in fact and have lost money as a result of Humana's misconduct. Plaintiffs and the Class had their coverage automatically

and illegally denied by Humana's use of the nH Predict AI Model without individualized evaluation of their medical records by Humana's medical directors.

131.   A class action is superior to other available methods for fair and efficient adjudication of this controversy. The expense and burden of individual litigation would make it impracticable or impossible for the Class to prosecute their claims individually.

132.   The trial and litigation of Plaintiffs' claims are manageable. Individual litigation of the legal and factual issues raised by Humana's conduct would increase delay and expense to all parties and the court system. The class action device presents far fewer management difficulties and provides the benefits of a single, uniform adjudication, economics of scale, and comprehensive supervision by a single court.

133.   Humana has acted on grounds generally applicable to the entire Class, thereby making final injunctive relief and/or corresponding declaratory relief appropriate with respect to the Class as a whole. The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Humana.

134.   Absent a class action, Humana will likely retain the benefits of its wrongdoing. Because of the small size of the individual Class members' claims, few, if any, Class members could afford to seek legal redress for the wrongs complained of herein. Absent a representative action, the Class will continue to suffer losses and Humana will be allowed to continue these violations of law and to retain the proceeds of its ill-gotten gains.

## FIRST CAUSE OF ACTION
## BREACH OF CONTRACT—NATIONWIDE
### *(On Behalf of Plaintiffs and the Nationwide Class)*

135.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

136.    Humana formed an agreement and entered into a contract of insurance ("insurance agreement") with Plaintiffs and Class members including offer, acceptance, and consideration.

137.    Pursuant to that insurance agreement, Plaintiffs and the Class paid money to Humana in exchange for Humana providing a health insurance policy to Plaintiffs and the Class. Humana received premiums in exchange for the issuance of a policy of health insurance.

138.    Each insurance agreement included, without limitation, Defendant's duty to exercise its fiduciary duties to policyholders, abide by applicable state laws, and adequately review and inform policyholders prior to a claim denial.

139.    Each insurance agreement included a provision stating: "At Humana, a process called Utilization Management (UM) is used to determine whether a service or treatment is covered and appropriate for payment under your benefit plan. Humana does not reward or provide financial incentives to doctors, other individuals or Humana employees for denying coverage or encouraging under use of services. In fact, Humana works with your doctors and other providers to help you get the most appropriate care for your medical condition."

140.   Each insurance agreement included a provision stating: "If our answer is no to part or all of what you requested, we will send you a written statement that explains why we said no."

141.   Plaintiffs and the Class performed their obligations under the contract by timely paying the amounts due under the contract.

142.   Humana breached each insurance agreement by, without limitation, failing to keep its promise to fulfill its fiduciary duties to policyholders, abide by applicable state laws, provide a thorough, fair, and objective investigation of each submitted claim prior to a claim denial, and provide written statements to Plaintiffs and the Class, accurately listing all bases for Humana's denial of claims and the factual and legal bases for each reason given for such denial.

143.   Humana breached each insurance agreement by making coverage determinations based upon the prediction of the nH Predict AI Model, rather than "work[ing] with your doctors and other providers to help you get the most appropriate care for your medical condition."

144.   Humana breached each insurance agreement by failing to disclose that the nH Predict AI Model prediction was the basis for coverage determinations and for providing false pretextual reasons for the determinations, rather than providing an accurate "written statement that explains why we said no."

145.   By using the nH Predict AI Model to resolve Plaintiffs' and Class members' claims without an adequate individualized investigation, Humana breached the insurance agreement.

146.     As a direct and proximate result of Humana's breach of contract, Plaintiffs and the Class have suffered damages in an amount to be proven at trial.

## SECOND CAUSE OF ACTION
### BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING—NATIONWIDE
### (*On Behalf of Plaintiffs and the Nationwide Class*)

147.     Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

148.     Plaintiffs and Class members entered into written insurance agreements with Humana and that provided for coverage for medical services administered by healthcare providers.

149.     Pursuant to the contracts, Humana implied and covenanted that they would act in good faith and follow the law and the contracts with respect to the prompt and fair payment of Plaintiffs' and Class members' claims.

150.     Humana has breached its duty of good faith and fair dealing by, among other things:

    a.  Improperly delegating its claims review function to the nH Predict AI Model system which uses an automated process to summarily deny claims;

    b.  Failing to require its agents to conduct a thorough, fair, and objective investigation of each submitted claim, such as examining patient records, reviewing coverage policies, and using their expertise to decide whether to approve or deny claims to avoid unfair denials.

151.    Humana's practices as described herein violated its duties to Plaintiffs and Class members under the insurance contracts.

152.    Humana's practices as described herein failed to provide Plaintiffs and Class members a thorough, fair, individualized, and objective investigation of each of their claims in breach of the implied covenant of good faith and fair dealing arising from Humana's insurance agreements.

153.    Humana's breach of Plaintiffs' and Class members' right to a thorough, fair, and objective investigation damaged Plaintiffs and Class members.

154.     As a direct and proximate result of Humana's breaches, Plaintiffs and Class members have suffered and will continue to suffer in the future, economic losses and other general, incidental, and consequential damages in amounts according to proof at trial. Plaintiffs and Class members are also entitled to recover statutory and nominal damages, and prejudgment interest, against Humana.

155.    Humana's misconduct was committed intentionally, in a malicious, fraudulent, despicable, and oppressive manner, entitling Plaintiffs and Class members to punitive damages against Defendant.

### THIRD CAUSE OF ACTION
#### UNJUST ENRICHMENT
**(*On Behalf of Plaintiffs and the Nationwide Class and, alternatively, the North Carolina, Minnesota, Kentucky, Wisconsin, and Texas Subclasses*)**

156.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

157.   By delegating the claims review process to the nH Predict system, Humana knowingly charged Plaintiffs and Class members insurance premiums for a service that Humana failed to deliver; this was done in a manner that was unfair, unconscionable, and oppressive.

158.   Humana knowingly received and retained wrongful benefits and funds from Plaintiffs and Class members. In so doing, Humana acted with conscious disregard for the rights of Plaintiffs and Class members.

159.   As a result of Humana's wrongful conduct as alleged herein, Humana has been unjustly enriched at the expense of, and to the detriment of, Plaintiffs and members of the Class.

160.   Humana's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

161.   Under the common law doctrine of unjust enrichment, it is inequitable for Humana to be permitted to retain the benefits they received from Plaintiffs and the Class because Humana delegated its claims process to the nH Predict AI Model in an unfair, unconscionable, and oppressive manner. Humana's retention of such funds is inequitable and constitutes unjust enrichment.

162.   The financial benefits derived by Humana rightfully belong to Plaintiffs and Class members. Humana should be compelled to return in a common fund for the benefit of Plaintiffs and members of the Class all wrongful or inequitable proceeds received by Humana.

163.    Plaintiffs and members of the Class have no adequate remedy at law. Plaintiffs plead this count in the alternative and in addition to their breach of contract claim. Under this alternative theory, Plaintiffs allege that the contract between the parties is unenforceable or void, or that the terms are materially disputed so as to prevent a meeting of the minds.

## FOURTH CAUSE OF ACTION
### VIOLATION OF N.C. Gen. Stat. § 58-63-15—NORTH CAROLINA UNFAIR CLAIMS SETTLEMENT PRACTICES
*(On Behalf of Plaintiff Susan Hagood and the North Carolina Subclass)*

164.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

165.    Pursuant to N.C. Gen. Stat. § 58-63-15, Humana is prohibited from engaging in unfair claims settlement practices.

166.    Humana has nevertheless engaged, and continues to engage, in unfair claims settlement practices by delegating its evaluation of claims to the nH Predict AI Model. Humana adopted this process to unreasonably and prematurely refuse to cover care for Medicare Advantage patients in post-acute care facilities without sufficient individual and holistic review.

167.    Defendant failed to initiate and conclude a claims investigation into Plaintiffs' and Class member's claims with all reasonable dispatch. Instead, Defendant relied on the nH Predict AI Model without an individualized investigation.

168.    Defendant made no good faith attempt to effectuate a fair and equitable settlement of Plaintiffs' and Class members' claims, for which liability would have been

reasonably clear had Defendant conducted an adequate investigation. The nH Predict AI Model does not account for individuals' unique circumstances or the statutorily required coverage determination criteria.

169.    Defendant failed to adopt and implement reasonable standards for the prompt investigation of claims arising under their insurance policies.

170.    In issuing its denials based on nH Predict, Defendant refused to pay claims without conducting a reasonable investigation based upon all available information.

171.    Defendant ignored and continues to ignore patients' medical records, individual circumstances, and physicians' recommendations while strictly adhering to whatever recommendations the nH Predict AI Model issued.

172.    Defendant knew of the dire consequences of denying elderly patients' medical treatment, yet still used the nH Predict AI Model rather than licensed physicians to review and deny claims without any reasonable or arguable reason for doing so, recklessly and maliciously disregarding the health and lives of Plaintiffs and the Class.

173.    Defendant knew or reasonably should have known that the nH Predict AI Model was not a suitable substitute for individual holistic review of Plaintiffs' and the Class members' claims and was an inadequate method for deciding to deny claims. Due to the enormous increase in the number of coverage denial appeals, as well as the 90 percent success rate of those appeals, Defendant has been put on notice that its systemic reliance on the nH Predict AI Model wrongly denies coverage.

174.    As a direct and proximate result of Defendant's violation of N.C. Gen. Stat. § 58-63-15, Plaintiffs and the Class have suffered damages in an amount to be proven at trial.

### FIFTH CAUSE OF ACTION
### VIOLATION OF N.C. Gen. Stat. § 75-1.1—NORTH CAROLINA UNFAIR METHODS OF COMPETITION
### *(On Behalf of Plaintiff Susan Hagood and the North Carolina Subclass)*

175.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

176.    Pursuant to N.C. Gen. Stat. § 75-1.1, Humana is prohibited from engaging in unfair or deceptive acts or practices, or unfair methods of competition, in or affecting commerce.

177.    Humana has nevertheless engaged, and continues to engage, in unfair or deceptive acts or practices or unfair methods of competition in or affecting commerce by delegating its claims review and approval process to an algorithm designed to prematurely refuse coverage for Medicare Advantage patients without sufficient individual and holistic review.

178.    Violations of N.C. Gen. Stat. § 58-63-15(11) constitute *per se* violations of N.C. Gen. Stat. § 75-1.1. As alleged in the immediately preceding cause of action, Humana has violated N.C. Gen. Stat. § 58-63-15(11), resulting in a *per se* violation of N.C. Gen. Stat. § 75-1.1.

179.     Defendant failed to initiate and conclude a claims investigation into Plaintiffs' and Class member's claims with all reasonable dispatch. Instead, Defendant relied on the nH Predict AI Model in bad faith and without an individualized investigation.

180.     As a direct and proximate result of Defendant's violation of N.C. Gen. Stat. § 75-1.1, Plaintiffs and the Class have suffered damages in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION
### INSURANCE BAD FAITH
#### (On Behalf of Plaintiffs and the Multi-State Class)

181.     Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

182.     Plaintiffs hereby assert claims under the insurance bad faith laws of the following states: Arizona, California, Colorado, Delaware, Hawaii, Iowa, Kentucky, Massachusetts, Nebraska, North Carolina, North Dakota, Ohio, Oklahoma, Rhode Island, South Carolina, South Dakota, Vermont, Washington, West Virginia, Wisconsin, and Wyoming (the "Bad Faith Claim States").

183.     The Bad Faith Claim States have bad faith insurance common law claims with substantially similar elements and remedies.

184.     The Bad Faith Claim States prohibit using bad faith or unreasonable means to make coverage determinations under an insurance policy.

185.     Plaintiffs and other Multi-State Class members have standing to pursue a cause of action for insurance bad faith in the states listed above because Plaintiffs and Multi-State Class members have suffered an injury in fact, and lost money as a result of Defendant's actions set forth herein.

186.   Plaintiffs and Class members were covered persons under the insurance agreements.

187.   Defendant used and continues to use the nH Predict AI Model to make coverage determinations in bad faith that should be made by licensed physicians who conduct a thorough and holistic review of each patient's medical history and condition. This bad faith process leads Defendant to unreasonably refuse coverage for medically necessary post-acute care. The nH Predict AI Model does not account for individuals' unique circumstances or the statutorily required coverage determination criteria. The nH Predict AI Model denies coverage that is legally guaranteed to Defendant's insureds.

188.   Defendant lacked a reasonable basis for using the nH Predict AI Model to make coverage determinations. Defendant's use of previous patients' data to determine its insureds' future care without regard for individual circumstances, doctors' recommendations, and patients' actual conditions is unreasonable.

189.   Defendant's bad faith conduct was and continues to be malicious and intentionally designed to deprive Plaintiffs and the Class of their rights under the insurance agreement. Defendants knew of the dire consequences of denying elderly patients' medical treatment, yet still used the nH Predict AI Model rather than licensed physicians to review and deny claims without any reasonable or arguable reason for doing so, recklessly and maliciously disregarding the health and lives of Plaintiffs and the Class. Defendant ignored patients' medical records, individual circumstances, and physicians' notes while strictly adhering to whatever recommendations the nH Predict AI Model issued.

190.   Upon information and belief, Defendant's denial of Plaintiffs' and Class members' claims was based on the malicious implementation of the nH Predict AI Model intended to enable Defendant to deny as many claims as possible and to pay out as little as possible. Defendant's denial of Plaintiffs' and Class members' claims was not the result of an honest disagreement or an innocent mistake.

191.   Defendant knew or reasonably should have known that the nH Predict AI Model was not a suitable substitute for individual holistic review of Plaintiffs' and the Class members' claims. Due to the enormous increase in the number of coverage denial appeals, as well as the 90 percent success rate of those appeals, Defendant has been put on notice that the nH Predict AI Model wrongly denies coverage in the vast majority of cases.

192.   By using nH Predict to predict Plaintiffs' and the Class members' required coverage for post-acute care, Defendant failed to conduct an adequate investigation before denying their claims. Defendant did not consider individual factors that may affect the recovery period or amount of care a patient requires, and routinely ignored the recovery time or treatment prescribed by Plaintiffs' and the Class members' physicians.

193.   As a direct result of Defendant's insurance bad faith, Plaintiffs and the Class have sustained damages in an amount to be determined at trial.

194.   Defendant has engaged in insurance bad faith and is liable to Plaintiffs and the Class for any and all damages that they sustained as a result of its bad faith conduct.

195.   Defendant's bad faith conduct is the actual and proximate cause of the damages sustained by Plaintiffs and the Class.

196.    As a result of Defendant's bad faith conduct, Class members suffered severe emotional distress. Class members did not know whether they would be able to receive necessary care, whether they would be forced to pay out of pocket for said care, or whether they would be financially able to pay for said care, causing severe emotional distress.

197.    Class members' emotional distress caused pecuniary loss whereby they had to pay out of pocket for treatment, by disrupting Class members' lives and schedules, by causing Class members to miss work and lose wages, and by other means.

198.    Defendant's misconduct was committed intentionally and willfully, in a malicious, fraudulent, wanton, and oppressive manner, entitling Plaintiffs and Class members to punitive damages against Defendant. Defendant acted with an "evil mind" in delegating its claims review and approval to an algorithm designed to deny claims to increase their profits.

199.    Plaintiffs and the Class are entitled to an award of punitive damages based on Defendant's malicious conduct.

200.    By reason of the conduct of Defendant as alleged herein, Plaintiffs have necessarily retained attorneys to prosecute the present action. Plaintiffs are therefore entitled to reasonable attorneys' fees and litigation expenses, including expert witness fees and costs, incurred in bringing this action.

201.    Defendant knew or should have known that the nH Predict system was an inadequate method for deciding to deny claims and knew or recklessly disregarded that there was no reasonable basis for denial of Plaintiffs' and Class members' claims.

202.    Defendant's conduct constitutes aggravating and outrageous conduct.

203.    By reason of the conduct of Defendant as alleged herein, Plaintiffs are entitled to attorneys' fees and costs associated with bringing this litigation.

**SEVENTH CAUSE OF ACTION**
**UNFAIR AND DECEPTIVE INSURANCE PRACTICES—MINNESOTA**
*(On Behalf of Plaintiff Barrows and the Minnesota Subclass)*

204.    Plaintiff realleges and incorporate by reference all preceding allegations as though fully set forth herein.

205.    Plaintiff as used in this count refers to Plaintiff Barrows.

206.    Defendant's denials of Plaintiff's and Class members' claims were based on the malicious implementation of the nH Predict AI Model intended to enable Defendant to deny as many claims as possible and to pay out as little as possible.

207.    A reasonable insurer would not have used the nH Predict AI Model to make coverage determinations.

208.    Defendant knew or should have known that the nH Predict system was an inadequate method for deciding to deny claims and knew or recklessly disregarded that the nH Predict AI Model was not a reasonable basis for denial of Plaintiff's and Class members' claims.

209.    Defendant failed to conduct an adequate independent investigation into Plaintiff's and Class members' claims before issuing a denial, acting with reckless disregard for whether there was a reasonable basis to deny the claims.

210.    Defendants' use of the nH Predict AI Model violates Minn. Stat. § 72A.02, which is enforceable by plaintiffs through Minn. Stat. § 8.31, subd. 3a.

## EIGHTH CAUSE OF ACTION
## COMMON LAW FRAUD
### *(On Behalf of Plaintiffs, the North Carolina, Minnesota, Kentucky, Wisconsin, and*

### *Texas Subclasses)*

211.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

212.    As alleged more fully above, Defendant made material omissions of fact to Plaintiff and Class members. Specifically, prior to Plaintiffs and the Class purchasing and renewing their insurance policies with Defendant, Defendant failed to disclose (1) its coverage determinations would be made by an algorithm under a process designed to deny claims on sham pretenses, and (2) the algorithm would not conduct an individualized objective investigation.

213.    Defendant knew that its material omissions were false and misleading when made.

214.    Defendant intended that Plaintiffs and Class members rely on these material omissions when purchasing and renewing insurance policies with Defendant. Plaintiffs and the Class reasonably relied on these omissions. Had Defendant conspicuously disclosed the truth in its contract of insurance or pre-sale marketing, Plaintiffs would have been aware of it.

215.    Defendant's material omissions were a substantial factor and proximate cause in causing damages and losses to Plaintiffs and Class members.

216.    Defendant engaged in this fraud to Plaintiffs' and the Class's detriment to increase Defendant's own sales and profits.

217.    Plaintiffs and Class members were injured as a direct and proximate result of Defendant's conduct because they would not have purchased medical coverage from Defendant had they known the truth; or at minimum, they would have paid less for insurance coverage from Defendant.

218.    Plaintiffs seek damages according to proof at trial.  By reason of the conduct of Defendant as alleged herein, Plaintiffs are also entitled to punitive damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, request that this Court enter an order granting the following relief against Defendant:

a.      Awarding actual damages, consequential damages, statutory damages, nominal damages, exemplary/punitive damages, costs and attorneys' fees;

b.      Awarding damages for emotional distress;

c.      Awarding disgorgement and/or restitution;

d.      Awarding pre-judgment interest to the extent permitted by law;

e.      Appropriate declaratory and injunctive relief enjoining Defendant from continuing its improper and unlawful claim handling practices as set forth herein;

f.      Such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiffs demand a jury trial on all triable issues.

DATED: April 22, 2024

Respectfully submitted,

BY:  /s/ John C. Whitfield, Esq.
John C. Whitfield, Esq.
**WHITFIELD CROSBY & FLYNN PLLC**
19 North Main Street
Madisonville, KY 42431
Telephone: (270) 821-0656
Facsimile: (270) 825-1163
Email: jwhitfield@wcfjustice.com

Gary M. Klinger
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Tel: (866) 252-0878
Email: gklinger@milberg.com

Glenn A. Danas, Esq.
Ryan Clarkson, Esq.
Zarrina Ozari, Esq.
*Pro Hac Vice*
**CLARKSON LAW FIRM, P.C.**
22525 Pacific Coast Highway
Malibu, CA 90265
Tel: (213) 788-4050
Emails: gdanas@clarksonlawfirm.com
        rclarkson@clarksonlawfirm.com
        zozari@clarksonlawfirm.com

James F. Guilfoyle, Esq.
**GUILFOYLE LAW OFFICE**
211 East Market Street
New Albany, IN 47150
Tel: (502) 208-9704
Email: james@guilfoylelawoffice.com

***Attorneys for Plaintiffs***